IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SAMUEL BOWMAN,

Petitioner,

v.

SCOTT FRAKES, Director,

Respondent.

8:17CV344

MEMORANDUM AND ORDER

Samuel Bowman (Bowman or Petitioner) has filed a petition for writ of habeas corpus. Respondent has answered and has filed the relevant state court records. The matter has been briefed by both sides. I now deny the petition, dismiss it with prejudice, and refuse to grant a certificate of appealability.

***Claims***

When I progressed this case, I summarized and condensed the claims for clarity and noted my summary of potentially cognizable claims was not a final determination. This is how I summarized the condensed claims:

Claim One: Petitioner's right to be free from unreasonable search and seizure under the 4th, 5th, and 14th Amendments was violated because the trial court erred in not granting Petitioner's motion to suppress for the following reasons: (1) Petitioner revoked his consent to the search; (2) Trooper Bauer's tests on the tire of the rental car were unreliable and could not form the basis for probable cause; and (3) police lacked probable cause to initially detain Petitioner and to later place him into custody.

Claim Two: Petitioner's rights to due process and against unreasonable search and seizure under the 4th, 5th, and 14th

Amendments were violated when the trial court received into evidence the seized cocaine with its chain of custody tainted by law enforcement's violations of federal law.

Claim Three: Petitioner's rights to due process and against unreasonable search and seizure under the 4th, 5th, and 14th Amendments were violated because the trial court erred in allowing Vicky Cowan to testify to the weight of the seized cocaine.

Claim Four: Petitioner was denied his rights against self-incrimination and to counsel under the 5th and 6th Amendments because the trial court failed to grant Petitioner's motion for a mistrial based on the prosecutor's use of Petitioner's post-arrest silence and request for counsel as evidence of his guilt.

Claim Five: Petitioner was denied effective assistance of counsel in violation of the 6th and 14th Amendments because trial counsel: (1) failed to have the official court reporter make a record of the closing arguments and (2) gave unreasonable advice to Petitioner to not testify at trial.

***Background***

Petitioner was sentenced to 20 years in prison for a drug conviction after a jury trial. Bowman was driving a rented minivan with another fellow as a passenger and got stopped for speeding while heading east on I-80.[1]

[1] This background is mainly derived from the direct appeal opinion (filing no. 10-3), the appeal from the denial of post-conviction relief (filing no. 10-4) and the 10-page opinion denying post-conviction relief issued by the trial judge (filing no. 10-13).

Although tedious but necessary to read, here is how the Nebraska Court of Appeals carefully described what happened during the stop and the somewhat unusual events that followed:

> On November 28, 2011, Bauer initiated a traffic stop of a silver minivan traveling eastbound on I-80. As Bauer approached the passenger side of the minivan, she observed that all of the back passenger seats were gone except for one and that there was a "doughnut" spare tire (doughnut tire) in the back cargo area, which she testified was "odd" because it was not where a spare tire would be in that type of minivan. Bauer also observed duffelbags and a milk crate with mechanical supplies, including gas or antifreeze, inside the minivan.
>
> Bauer made contact with the occupants of the vehicle. Bowman was driving the minivan, and Donzell Williams was in the front passenger seat. Bauer advised Bowman that she stopped him for driving in excess of the posted speed limit, and she asked Bowman for his driver's license, registration, and proof of insurance. Bowman informed Bauer that the minivan was a rental vehicle and provided her with a rental agreement and his Nevada driver's license. The rental agreement reflected the minivan was rented in Las Vegas, Nevada, on November 26, 2011, and was due back in Las Vegas on November 28, by 10 p.m. (within a few hours of the traffic stop). Bauer found this significant because at the time she stopped the minivan, it was still traveling eastbound. Bauer collected Bowman's driver's license and the rental agreement, and she asked him to come to her patrol car. Bowman complied.
>
> Bauer began entering Bowman's information into the patrol car's ticket writing system to give him a warning for speeding. Bowman was seated in the front passenger seat of Bauer's patrol car. As Bauer was writing the warning, she began asking Bowman questions about his trip. Bowman first told Bauer that he and Williams, who he called his brother, were traveling to Chicago, Illinois, to pick up Williams' children, but later he told Bauer they were traveling to Chicago for a birthday party for one of Williams' children who was turning 5 years old. Bauer requested that dispatch check the status of Bowman's driver's license

and run a check of his criminal history. Bauer was advised that Bowman had a valid driver's license, but that he had a positive criminal history for drug offenses.

Bauer testified that she could not complete the warning without entering all of the minivan's information into the system, so she returned to the minivan to locate its registration. Bauer made contact with Williams, who was still seated in the minivan's front passenger seat, and asked him where they were going. Williams replied they were going to Chicago to see family and that one of his children was turning 6 years old. Williams also spontaneously stated that his mother was a "cop" with the Chicago Police Department and that he and Bowman were brothers.

Bauer returned to her patrol car to check for warrants and criminal history for Williams. Bauer had noticed some discrepancies between Bowman's and Williams' statements, so she tried to clarify with Bowman. Bauer asked Bowman what his mother did for work, and he replied the family they were visiting did not have jobs, which conflicted with Williams' statement that their mother was a "cop." Bowman then clarified that he and Williams were not actually brothers, but called one another brothers because they have known each other for a long time.

Bauer completed the warning, printed it off, and handed it to Bowman. Bauer also returned to Bowman the minivan's paperwork and Bowman's and Williams' driver's licenses. Bauer explained to Bowman that he did not have to do anything further for the warning. Bauer testified that as Bowman grabbed the patrol car's door handle to open the door, she asked him if she could ask him a few more questions, if he had time. According to Bauer, Bowman pulled the door shut and continued to speak with her.

Bauer began asking Bowman a series of questions regarding whether he had guns, weapons, or large amounts of cash. Bauer testified that Bowman's demeanor changed when she began asking about drugs and that he turned away from her and stopped looking her in the eye. Bauer then asked Bowman if he would consent to a search of the minivan and its contents. According to Bauer, Bowman verbally replied

yes. Bauer then produced a written voluntary search consent form, which Bauer testified Bowman signed.

Bauer told Bowman that he could stay in the front seat of her patrol car during the search because it was a cold and windy day and that he could honk the horn to get her attention if he wished to discontinue the search. Bauer tucked the written consent form in the visor on the driver's side of the patrol car. Bauer called for assistance and returned to the minivan. Bauer told Williams that Bowman had given her consent to search the vehicle and its contents. Williams was cooperative and gave permission to search his bag. Bauer instructed Williams to take a seat ahead of the minivan in the "road ditch" during the search.

Investigator Mike Dowling arrived to assist Bauer. During the search, Dowling stood at the passenger-side door of Bauer's patrol car to observe Bowman. Nebraska State Trooper Ken Moody arrived shortly thereafter and assisted Bauer with the search. Bauer testified she observed a doughnut tire laying in the back of the minivan, without being in a container or tire compartment. Moody also testified that it was "very odd" that there was a doughnut tire laying in the cargo area of the minivan. Moody knew someone who had the same type of minivan and knew the spare tire carrier was underneath the vehicle. Bauer looked underneath the vehicle and saw there was another tire inside the spare tire carrier.

Bauer observed that the tire inside the carrier was a standard-sized tire, not a doughnut tire. Moody observed that the tire did not seem to fit or belong in the carrier. Both troopers observed that the tire appeared to be older because the tread was thin. Bauer observed that there was a chunk of tread missing and that the tire had chalk writing on it. Neither Bauer nor Moody believed the tire was roadworthy. Bauer asked Bowman why he had two spare tires, and he replied he asked the rental company to provide him with another tire for the trip because he did not feel a doughnut tire was sufficient for travel. Bauer testified the information given to her by Bowman seemed suspicious given the condition of the tire.

> Moody testified that when he bounced the tire, he felt a "second bounce" or the vibration of something else inside the tire.
>
> Bauer retrieved a stethoscope and mallet from her patrol car to perform an "echo" or "ping" test on the tire, which test she had learned during a drug interdiction course. Bauer testified the echo test was the most telling thing for her that there was possibly contraband inside the tire and that she then determined the tire needed further inspection. The troopers had no means of separating the tire from the rim on I-80, so Bauer transported Bowman and the tire to a local auto dealership in Lexington, Nebraska, approximately 3 miles away from the location where Bowman was initially stopped. Moody stayed at the scene with Williams.
>
> The tire was taken apart at the tireshop, and inside the wheel were two black plastic wrapped items. Inside the black plastic packages were four bags with white powdery substances inside, which Bauer believed was cocaine. Bauer then advised Bowman he was under arrest, advised him of his *Miranda* rights, and asked if he wished to make any statements. Bowman shook his head no. Bauer transported Bowman to the jail. During the booking process as Bauer went through Bowman's property, Bauer discovered the written consent form, crumpled and torn, inside the minivan's rental papers.

(Filing 10-3 at CM/ECF pp. 2-4.)

Bowman was charged. Suppression motions were filed and denied. These motions were broad in nature seeking to suppress the drugs, the legality of the entire encounter due to a lack of probable cause or reasonable suspicion, illegal detention, statements given in violation of *Miranda*, questions outside the scope permitted by law, search of the vehicle without consent or outside the scope of consent, and search after consent was withdrawn. The case proceeded to a jury trial. A chemist from the state crime lab testified both as to the nature of the substance and the weight. Bowman presented no evidence and he did not testify.

As is frequently the case in the Nebraska courts, the opening and closing arguments were not recorded because no one requested the court reporter to do so as they could have done under Nebraska law. During the closing argument a dispute arose.

The trial judge, when denying the motion for post-conviction relief predicated upon an assertion of ineffective assistance of counsel, and writing in the third person, described what happened regarding the closing arguments:

> The trial records and bill of exceptions show that neither party requested the opening or closing statements be recorded. During the prosecutor's closing argument the defendant's trial counsel made an objection. A bench conference was held, at which time Bowman's trial counsel stated:
>
>> [Trial counsel]: Asserting one's Sixth Amendment Right to an attorney or choosing to remain silent is a Constitutional Right that cannot be used to presume guilt. I am moving forward - that those ... I am moving for a mistrial based upon those improper statements made during closing argument. The fact that he asserted his right or remained silent or didn't do anything isn't evidence of anything, and it flies in the face of his Fifth Amendment Right not to say anything and probably at that point his Sixth Amendment Right to counsel.
>>
>> [Prosecutor]: There is an instruction that will cover that issue, and it will cover that, that he has a right not to testify and that, that it can't be held against him.
>>
>> [Trial Counsel]: Exactly, and so it's improper for the prosecutor to comment on that during closing argument.
>
> Thereafter, the trial court stated that it would instruct the jury to disregard the statements by the prosecutor. At which time, Bowman's trial counsel moved for a mistrial which motion was denied. Thereafter, the court instructed the jury to disregard any comment made by the

> prosecutor concerning any request by the defendant to talk with a lawyer or the lack of any response from the defendant.

(Filing no. 10-13 at CM/ECF p. 3.)

On appeal from the denial of the post-conviction motion, the Nebraska Court of Appeals described what the trial court record reflected regarding Bowman's decision not to testify:

> After the State rested its case at trial, Bowman's counsel indicated that he was not going to present any evidence and asked the court "to inquire of the defendant about his right to testify." In response to the court's questioning, Bowman stated he understood his counsel was not going to present any evidence, he had a right to testify, no one could stop him from testifying, and he had a right to remain silent to avoid self-incrimination, and if he did not testify, he would waive the right to do so. Bowman also indicated to the court that he had talked the matter over with his attorney, that his attorney had advised him on the decision about whether to testify, that he was satisfied with his attorney's advice on the issue, and that he did not need additional time to discuss the matter with his attorney. Bowman further indicated he understood that by not calling any witnesses he was giving up his right to present a defense and that he had discussed the matter with his attorney. Upon the court's inquiry, Bowman responded that no one had threatened, pressured, or forced him in any way or promised him anything to get him to give up his right to testify or present a defense.

(Filing no. 10-4 at CM/ECF pp. 11-12.)

Additionally, when I proceed to my analysis, I may supplement the background if necessary.

### ***Claims Raised in the Appeals***

On direct appeal (filing no. 10-3), Bowman made the following arguments: (1) the district court erred in overruling the motion to suppress; (2) the chain of custody

for the seized cocaine was improperly established; (3) the district court erred in allowing the forensic chemist to testify to the weight of the seized cocaine; and (4) the district court erred in overruling his motion for mistrial during closing arguments due to the State's statements regarding Bowman's invocation of his Fifth and Sixth Amendment rights as proof of guilt. The Court of Appeals denied the appeal and affirmed the conviction.

On appeal from the denial of post-conviction relief (filing no. 10-4), Bowman made these arguments: (1) trial counsel (who was also counsel on the direct appeal) was ineffective for failing to request recording of the closing arguments; and (2) trial counsel was ineffective concerning Bowman's decision not to testify at trial. Like the direct appeal, this appeal was unsuccessful.

***Overview of Applicable Law***

Various strands of federal habeas law intertwine in this case. They are the law of exhaustion and procedural default, the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court, the standard for evaluating a claim of ineffective assistance of counsel, and the doctrine of *Stone v. Powell* which normally precludes second-guessing Fourth Amendment questions when they have been fairly evaluated by the state courts.

I briefly set out those principles now, so that I may apply them later in a summary fashion as I review Petitioner's claims. I turn to that task next.

***Exhaustion and Procedural Default***

As set forth in 28 U.S.C. § 2254:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B) (i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional

provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation marks omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo,* 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa,* 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

***Nebraska Law Relevant to Procedural Default***

Under Nebraska law, you don't get two bites of the post-conviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for

relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased."); *State v. Filholm*, 848 N.W.2d 571, 576 (Neb. 2014) ("When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.").

Moreover, a person seeking post-conviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying post-conviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.")

Additionally, if a person raises an issue in an initial motion for post-conviction relief but fails to raise it in an amended motion the claim is defaulted under Nebraska law. *State v. Armendariz*, 857 N.W.2d775, 789 (Neb. 2015) (affirming denial of post-conviction relief in a murder case and stating that "[a]n amended pleading supersedes the original pleading, whereupon the original pleading ceases to perform any office as a pleading. It is clear the district court did not err in limiting its analysis to the motion that was before it–the amended motion.").

Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged

error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Still further, it is up to the appellant in a criminal case to provide a Nebraska appellate court with a proper record that will allow the court to assess an assignment of error and failing the provision of a proper record the matter is defaulted. *See*, *e.g.*, *State v. Harris*, 290 N.W.2d 645, 650 (Neb. 1980) (Where it is claimed that an attorney is guilty of misconduct in arguing a case to a jury, the record must contain an objection, an adverse ruling and that these matters be made part of the record for review on appeal–absent such a record the court will not consider the assigned error.)

***Deference Under 28 U.S.C. § 2254(d)***

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id*.

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

***The Especially Deferential Strickland Standard***

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard *of Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id*. at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id*. at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id*. at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal

of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under Antiterrorism and Effective Death Penalty Act (AEDPA); Petitioner could not establish that Petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt").

***The Doctrine of Stone v. Powell***

As the Eighth Circuit Court of Appeals, in an en banc decision, has said:

> [A] Fourth Amendment claim is *Stone*-barred, and thus unreviewable by a federal habeas court, unless either the state provided no procedure by which the prisoner could raise his Fourth Amendment claim, or the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system. We believe that our approach flows naturally from the language of *Stone*, which we have emphasized in this opinion, and from *Stone's* rationale. As *Stone* makes clear,

> Fourth Amendment claims asserted by state prisoners in federal habeas petitions are to be treated differently from other constitutional claims because of the nature and purpose of the exclusionary rule and the incremental value gained from its implementation in the federal habeas situation compared with the costs it imposes upon the administration of justice. The federal courts on habeas review of such claims are not to consider whether full and fair litigation of the claims in fact occurred in the state courts, but only whether the state provided an opportunity for such litigation.

*Willett v. Lockhart*, 37 F.3d 1265, 1273 (8th Cir. 1994) (applying *Stone v. Powell*, 428 U.S. 465, 482, 494 (1976)).

### ***Analysis***

Having set forth the applicable law, and the basic background, I will now address each claim in turn.

Claim One is fundamentally predicated on the Fourth Amendment and challenges the stop, search and seizure. It is *Stone*-barred because it is clear from the record that the Nebraska courts provided Bowman with a full and fair hearing on the matter and there is absolutely no evidence to establish, or reason to believe, that there was an unconscionable breakdown in the state-court mechanism for considering all of Bowman's Fourth Amendment claims.

To the extent that Claim One raises an issue potentially outside of the Fourth Amendment–such as a due process argument that Bowman was unlawfully arrested when he was driven to the tire shop and not provided *Miranda* warnings prior thereto–I defer to the judgment of the Nebraska Court of Appeals:

> Even if we were to agree with Bowman's contention that he was illegally arrested during the trip to the tire shop (a question we need not reach), no evidence was obtained as a result of this alleged illegal arrest that the district court could have suppressed. Bowman made no statements during this time, and his general consent to search his vehicle occurred prior to this alleged period of illegal custody. . . As discussed above, the trial court was not clearly erroneous in finding that Bowman voluntarily consented to the search of his vehicle and its contents and that he did not withdraw his consent. The fact that Bowman argues that he was illegally detained or arrested during the time he was transported to the tireshop was irrelevant to the lawful search of the spare tire pursuant to his prior consent.

(Filing no. 10-3 at CM/ECF p. 9.)

As for the second claim–that the trial court received into evidence the seized cocaine with its chain of custody tainted by law enforcement's violation of federal law–I defer to the Court of Appeals on this frivolous argument. Bowman argued that because the state troopers mailed the suspected drugs to the lab via certified mail that this mailing violated federal criminal law and broke the chain of custody as a result. But as the Nebraska Court of Appeals correctly held 21 U.S.C. § 863[2] does not apply to law enforcement under the exemption found at 21 U.S.C. § 863(f) and even if it did the statute only applied to drug paraphernalia and not the drugs themselves. (Filing No. 10-3 at CM/ECF p. 10.)

As for the third claim–the trial court erred in allowing Vicky Cowan to testify to the weight of the seized cocaine–I agree with Respondent that no federal issue is or was presented since the essence of the argument related to Nebraska's foundational requirements for admitting results using measuring devices like a scale. But even if one were to review the Court of Appeals ruling on some sort of due process grounds and one further assumes that Bowman fairly presented the third claim as a federal

---

[2] In short, the statute makes it a federal crime to mail drug paraphernalia.

constitutional claim, the well-reasoned opinion denying the claim by the Court of Appeals is due deference. As the Nebraska Court of Appeals explained in detail, the scale had been properly calibrated according to the expert testimony of Ms. Cowan (who is well known to me from her testimony in countless federal drug cases). (Filing no. 10-3 at CM/ECF p. 11.)

Regarding Claim Four–the trial court failed to grant Petitioner's motion for a mistrial based on the prosecutor's use of Petitioner's post-arrest silence and request for counsel as evidence of his guilt–it was defaulted since Bowman failed to present a record of the closing argument where the prosecutor's allegedly improper remarks were made.[3] (Filing no. 10-3 at CM/ECF pp. 11-12.) In short, Bowman's claim was defaulted in state court pursuant to an independent and adequate state procedural rule and Bowman has not come close to excusing the default, for example, by showing cause and prejudice or establishing there was a miscarriage of justice.

As for Claim Five, it must be denied because the state district judge and the Nebraska Court of Appeals carefully examined the ineffective assistance of counsel claim–trial counsel (1) failed to have the official court reporter make a record of the closing arguments and (2) gave unreasonable advice to Petitioner to not testify at trial–under prevailing federal constitutional standards. (Filing no. 10-13 at CM/ECF pp. 2-11 (trial court); filing no. 10-4 at CM/ECF pp. 13 (court of appeals).) Therefore, giving the Nebraska courts the deference they are due, Bowman is not entitled to

---

[3] Under the Nebraska Court Rules of Appellate Practice, court reporters must make a verbatim record of evidence offered at trial, but a request must be made to record, among other things, opening statements and closing arguments. Nebraska Supreme Court Rule of Appellate Practice § 2-105(A)(1)&(2). Any lawyer or pro se party, as well as the judge, may make the request and if a request is made the reporter must make the record. In this case, no such request was made. (Filing no. 10-13 at CM/ECF p. 3.)

relief. A few brief observations regarding the reasoning of the Nebraska courts on the claim of ineffective assistance of counsel are in order.

As to the first argument, the Nebraska Court of Appeals observed that a cautionary and limiting instruction was promptly provided by the district judge, and, assuming for the sake of argument the trial counsel's performance was deficient in failing to request the closing arguments be recorded, Bowman was not able show prejudice under *Strickland*. This was, according to the Court of Appeals, particularly true given the strong evidence against Bowman such as the inconsistency between the dates on the rental agreement and his direction of travel, inconsistent explanations for the trip and the nature of their relationship given by Bowman and his passenger, evidence of alterations to the van, Bowman's change in demeanor when asked about drugs, his explanation for the extra spare tire in the van, and his attempt to destroy or conceal the consent to search form after the search was underway.

As to the second argument, after noting that the trial judge questioned Bowman at length about his decision not to testify, the Court of Appeals found that his decision not to testify was voluntary, that he had adequate time to consult with his lawyers, and that Bowman had in fact told the trial court he was satisfied with his counsel's performance at the time. Since Bowman failed to provide the post-conviction courts with what his testimony would have been, Bowman could not establish that the outcome of the proceedings would have been different. In other words, Bowman could not show prejudice.

***No Certificate of Appealability***

Lastly, a petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district

court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). I have applied the appropriate standard and determined that Petitioner is not entitled to a certificate of appealability.

IT IS ORDERED that the habeas corpus petition (filing no. 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

August 7, 2018.

BY THE COURT:

s/*Richard G. Kopf*
Senior United States District Judge